NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000446
10-OCT-2017
08:56 AM

NO. CAAP-15-0000446

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
BRIAN UNDERWOOD, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 14-1-00622)

SUMMARY DISPOSITION ORDER
(By: Nakamura, C.J., Ginoza and Chan, JJ.)

Defendant-Appellant Brian Underwood (**Underwood**) appeals from the Judgment of Conviction and Probation Sentence (**Judgment**) issued on May 27, 2015, by the Circuit Court of the First Circuit (**circuit court**).[1] Underwood was convicted by a jury of: Count I, Unlawful Imprisonment in the Second Degree in violation of Hawaii Revised Statutes (**HRS**) § 707-722 (2014);[2] and Count III, Abuse of

---

[1] The Honorable Glenn J. Kim presided.

[2] At the time of the incident in this case, HRS § 707-722 provided in pertinent part:

> §707-722  **Unlawful imprisonment in the second degree.**  (1) A person commits the offense of unlawful imprisonment in the second degree if the person knowingly restrains another person.
>
> . . . .
>
> (4) Unlawful imprisonment in the second degree is a misdemeanor.
> (continued...)

Family or Household Member in violation of HRS § 709-906(1) and (5) (Supp. 2013).[3]

On appeal, Underwood asserts the following points of error: (1) there was no substantial evidence to support his convictions; and (2) the deputy prosecuting attorney (**DPA**) committed misconduct during closing argument.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, as well as the relevant legal authorities, we resolve Underwood's points of error as follows and we affirm.

**(1) Sufficiency of the evidence.** Underwood argues that there was not sufficient evidence to support his convictions.

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

---

[2](...continued)
Additionally, HRS § 707-700 (2014) provided, in relevant part:

> "Restrain" means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty:
> (1) By means of force, threat, or deception[.]

[3] At the time of the incident in this case, HRS § 709-906(1) and (5) provided:

> **§709-906 Abuse of family or household members; penalty.** (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.
> For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons in a dating relationship as defined under section 586-1, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.
>
> . . . .
>
> (5) Abuse of a family or household member and refusal to comply with the lawful order of a police officer under subsection (4) are misdemeanors . . . .

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation omitted). "Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation and internal quotation marks omitted).

Underwood argues that "in order for [his] convictions to stand on appeal, the evidence supporting that conviction must be credible evidence." Underwood asserts that the testimony of the complaining witness (**CW**) and her sister (**Sister**) were not credible and thus his convictions should be vacated. However, as is often expressed, "[t]he jury, as the trier of fact, is the sole judge of the credibility of witnesses or the weight of the evidence." State v. Wagner, 139 Hawai'i 475, 485, 394 P.3d 705, 715 (2017) (quoting State v. Tamura, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981)).

In this case, there was sufficient evidence to support Underwood's convictions based on the CW's testimony and the testimony of Sister. With regard to the Abuse of Family or Household Member offense, the CW testified that at the time of the incident on April 5, 2014, she was living in Underwood's apartment, had been dating him for about ten months, and had been living with him for about three months. The day before the incident, the CW testified that she received texts and Facebook messages from two women who claimed to have been having phone, text, and Facebook conversations with Underwood. Over the course of the early morning hours on April 5, 2014, the CW had further communications with one of the women and ultimately confronted Underwood about the situation, which led to them arguing and deciding that the CW and her Sister (who was visiting) would move out of the apartment in the morning. Subsequently, while Underwood was sleeping, the CW made numerous printouts of messages between Underwood and the other women and placed them all over their bedroom. According to the CW, when Underwood awoke, he and the CW began to argue, Underwood threw a box of her

3

belongings out the door and onto the front lawn, and told the CW to take off the sweatpants she was wearing because they belonged to him. The CW gave the sweatpants to Underwood and was left wearing only a t-shirt.

Subsequently, the CW testified that she somehow ended up on the ground, that Underwood grabbed her ankles and began to pull her to the front door. When Underwood opened the front door, the CW was able to get free and crawled under a kitchen table. Underwood grabbed the CW's legs again and began to pull her toward the door, and the CW called for Sister. The CW testified that she felt pain in her head and legs as Underwood pulled her toward the door. After Sister came downstairs, the CW put on another pair of sweatpants and went outside to pick up her belongings on the lawn. As the CW was picking up her belongings, she felt something hit her head, turned around, and saw that Underwood was throwing bottles of Gatorade at her. The CW testified she believed Underwood threw at least four Gatorade bottles at her and her head felt sore from being hit with the bottles.

The evidence in the record is sufficient to support the jury's finding that Underwood committed the offense of Abuse of Family or Household Member.

With regard to the offense of Unlawful Imprisonment in the Second Degree, the CW's written statement given to the police on the day of the incident states, in pertinent part, that: Underwood had a gun in his hand and pushed the CW to the couch, that "[h]e held the gun to my head on the side and front", "I begged to leave", "[h]e pushed the gun firmly upon my head", and "[w]hen he had the gun to my head, I kept asking to go, but he said I couldn't go." According to the CW's written statement, Sister was ringing the door bell but Underwood would not answer it. Further, Sister testified that Underwood had allowed Sister and the CW to return to the apartment to retrieve their belongings. As they were leaving, Sister walked out of the door and heard the door slam and the CW was no longer behind her.

4

After a few minutes, Sister began to persistently ring the door bell, and the CW eventually came running out of the house looking scared. The CW told Sister that Underwood had a gun and was going to kill the CW. The CW further told Sister that Underwood had put the gun in her face.

At trial, the CW testified that she did not recall parts of the incident when she was on the couch. However, she also testified that since the incident in April 2014, she and Underwood had been in contact at certain points trying to work things out, and that they had been in contact up to about February or March of 2015.[4] The contact included texts, phone calls and face-to-face visits. The CW was living on Maui, but had come to Oahu a number of times to see Underwood, who had helped to pay for some of the CW's flights. During her contact with Underwood, they had discussed her testifying and although she did not recall what he said about it, she testified that "I know I wanted the best thing for him." The CW further testified that she was no longer in a relationship with Underwood, that she still loved him, and that she still wanted what is best for him.

In her testimony at trial, the CW could not recall details about Underwood holding a gun or when she was on the couch. However, given the totality of the evidence, the jury could have discounted the CW's trial testimony in this regard and relied on her written statement given to police on the day of the incident and Sister's testimony. The evidence in the record is sufficient to support the jury's finding that Underwood committed the offense of Unlawful Imprisonment in the Second Degree.

**(2) Prosecutorial misconduct.** Underwood contends that the DPA committed misconduct during closing argument when she argued that "[t]he defense attorney tried to get [the CW] to make up some story about how she tried to kick the defendant and she fell back[]" and further, when she argued that "the defense attorney tried to push [the CW] on cross-examination; tried to

---

[4] Trial started on March 16, 2015.

5

get her to say or admit that she tried to kick the defendant."

The defense cross-examination of the CW included the following:

Q. [Defense counsel] Why do you care if he's having relationships with other women?

A. [CW] Because I'm in a relationship with him.  I'm living with him, and we've talked about it before.  He said he wasn't having any relationships.

Q. And that angered you?

A. I was upset about it.  I was hurt.

Q. You went downstairs, right?

A. Yes.

Q. And you began talking to Mr. Underwood, right?

A. I don't remember what was said.

Q. But you -- my question was you began talking to Mr. Underwood, correct?

A. Yes.

Q. And there was a conversation going on, right?

A. Yes.

Q. And you became angry at him, right?

A. I wasn't angry at him.

Q. Then at some point you came up to him and got in his face, correct?

A. No.

Q. And then at some point you kicked him?

A. No.

Q. Correct? You attempted to kick him, correct?

A. No.

Q. At some point you fell down on the ground, correct?

A. I was on the ground.  I'm not sure how I got there:

Q. Well, he didn't push you down, right?

A. I don't remember how I got to the ground.

Q. Well, if he had pushed you down, you would

certainly remember it, right?

A. I'm not sure.

Q. In any event, you got to the ground somehow?

A. That's correct.

(Emphasis added.)

In light of this cross-examination, as well as the evidence in the record that the CW had numerous contacts with Underwood since the incident, that the CW had discussed testifying with Underwood, and her testimony that she still loved him and wanted the best for him, it was fair for the DPA to argue in closing that defense counsel had "tried to push the CW on cross-examination" and "tried to get [the CW] to say or admit that she tried to kick the defendant." However, we have concerns about the DPA's comment that "defense attorney tried to get [the CW] to make up some story about how she tried to kick the defendant and she fell back." The DPA's comment that defense counsel "tried to get [the CW] to make up some story" can be read as an attack on the integrity of defense counsel, and in that regard cannot be condoned. However, we disagree with the defense that it is similar, at least in degree, to the prosecutor's comments in State v. Klinge, 92 Hawai'i 577, 593, 994 P.2d 509, 525 (2000).[5] Rather, unlike the very direct and lengthier attack on defense counsel in Klinge, the comment here is brief and somewhat indirect.

We note that, although there was an objection by defense counsel to this comment, it was overruled and there was

---

[5] In Klinge, the defendant alleged several acts of misconduct by the prosecutor, including that the prosecutor stated during closing argument: "The defense lawyer did not tell you that like he's taking everything out of context like he's not going to give you the whole story. He's not going to give you the whole picture because he has a duty [to] get his client off." 92 Hawai'i at 593, 994 P.2d at 525. The supreme court determined that the statement constituted misconduct. However, because the trial court had sustained defense counsel's objection, ordered the statement stricken from the record, and advised the jury that "statements or remarks made by counsel are not evidence," and in light of the strength of the evidence against the defendant, the supreme court held that the remark was not so prejudicial as to have denied the defendant a fair trial. Id. at 595, 994 P.2d at 527.

no curative instruction.  During jury instructions, however, the circuit court did instruct the jury that "[s]tatements or remarks made by counsel are not evidence.  You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence."  Thus, given the entirety of the record, that the arguably offending comment was a one-time brief remark, that the circuit court gave the above instruction to the jury about statements made by counsel, and given the strength of the evidence against Underwood in this case, we conclude that there is no reasonable possibility that the DPA's comment might have contributed to Underwood's convictions.  Klinge, 92 Hawaiʻi at 584, 994 P.2d at 516.  Thus, we disagree with Underwood's contention that his convictions must be vacated based on the DPA's challenged statements.

Therefore, the Judgment of Conviction and Probation Sentence entered by the Circuit Court of the First Circuit on May 27, 2015, is affirmed.

DATED:  Honolulu, Hawaiʻi, October 10, 2017.

On the briefs:

Jon N. Ikenaga,
Deputy Public Defender,
Office of the Public Defender,
for Defendant-Appellant.

Brian R. Vincent,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge

8